# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF LEO, LLC; COASTAL VILLAGES REGION FUND; COASTAL ENTER-PRISES, LLC; and COASTAL VILLAGES SEAFOODS, LLC, AS OWNERS AND/ OR OPERATORS OF THE VESSEL LEO, OFFICIAL NUMBER 575074, FOR EXONERATION FROM AND/OR LIMITATION OF LIABILITY, | Case No. 09-1768RAJ |
| | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| Limitation Plaintiffs, | |
| vs. | |
| MATTHEW FLORA, | |
| Claimant. | |

The court conducted a bench trial in this matter September 26-28, 2011. At the conclusion of trial, the Court took the matter under advisement. The Court has heard and reviewed the testimony of witnesses, the evidence of record, and the arguments of counsel. The Court hereby makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

For the reasons stated below, the Petition for Limitation of Liability is Denied, the Petitioners' case is Dismissed with Prejudice, and the Clerk is instructed to forthwith enter a Final Judgment in favor of Claimant.

## FINDINGS OF FACT

1. Claimant Matthew Flora is 35 years old, single, and currently lives in Alaska. At all relevant times, Claimant Flora worked for Petitioner Leo, LLC as a seaman on M/V LEO.

2. Leo, LLC is wholly owned by Coastal Enterprises, LLC. Leo, LLC has no officers or directors. The only employees of Leo, LLC are the ship's crew. Coastal Enterprises, LLC has no officers or directors or employees. Coastal Enterprises, LLC is a holding company and is owned by Coastal Villages Seafoods, LLC. Coastal Villages Seafoods LLC ("Coastal Seafoods") is the manager and operator of M/V LEO. Coastal Villages is owned by Coastal Villages Regional Fund. There are no written management or operation agreements between Leo, LLC and any other Coastal entity. Petitioners admit that the privity or knowledge of Coastal Seafoods shall be imputed to all other Petitioners.

3. Coastal Seafoods and related corporations are located in Alaska and operate mainly in western Alaska. Coastal Seafoods purchased M/V LEO in 2007. M/V LEO is 76 feet long overall, an ex-United States military landing and recovery craft (LCM-6). In 2007, the vessel was brought to Seattle to undergo modifications. These modifications included installation of two "knuckle" cranes, port and starboard. (Exhibit 106). The cranes were installed on LEO in May 2007. These cranes were permanently installed on LEO. The cranes, wire, and hooks are considered to be permanent ship's equipment.

4. The crane hooks on LEO's cranes were originally designed to have safety

latches. A safety latch is a spring loaded mechanism that is designed to keep loads on the crane hook. In order to remove a load from a crane hook with a safety latch, the spring loaded latch would have to be manually depressed, allowing the load to be removed from the crane hook.

5. Prior to June 2009, M/V LEO was used mainly to deliver and haul cargo to villages in western Alaska. Coastal Seafoods registered M/V LEO with the Coast Guard with a "coastwise" registry, which was appropriate for purposes of hauling cargo between coastal ports.

6. M/V LEO is an "uninspected" vessel with respect to Coast Guard classification purposes.

7. On June 12, 2009, M/V LEO was being used as a fish tender vessel off the western coast of Alaska. Coastal Seafoods did not have LEO legally documented with a fisheries registry.

8. On June 12, 2009 (the first day of fishing of the voyage), Claimant Flora was working on the deck of LEO. A halibut catcher vessel came alongside. The port side crane, with a brailer and scale, were lowered to the catcher vessel. The crew on the catcher boat loaded the brailer with fish. The fish were weighed with an attached scale. LEO's crew then brought the load of halibut onto LEO so the crew could ice the fish in totes, later to be transported to shore for processing. The port side crane hook did not have a safety latch. The brailer and scale popped out of the port side crane hook. The scale and brailer came out of the portside crane hook because that hook did not have a safety latch. The scale struck Claimant Flora in the head, knocking him unconscious. At the time of injury, LEO was within 3 miles of Alaska's shore.

9. Claimant Flora suffered a permanent brain injury as a result of being struck on the head with the fish scale.

10. A safety latch would have kept the load in LEO's port side crane hook. Claimant would not have been injured if the crane hook had a safety latch.

11. In 2005, Coastal Seafoods hired Mr. Kevin Kennedy to be its Vessel Manager. According to Coastal Seafoods' Job Description (Exhibit 100), the Vessel Manager's duties included "total oversight of vessels safety,... scheduling routine maintenance and major repairs,...ensuring Coastal Villages is in compliance with all laws and regulations..., and approving all expenses." The vessels under this Manager's control included LEO. Vessel Manager Kennedy's responsibilities are managerial, and he had authority such that his knowledge constitutes the Petitioners' knowledge.

12. Mr. Kennedy was on board LEO on a regular basis when the vessel was in port. (Kennedy Dep., p. 26.) He described himself as a "hands on" manager, one that regularly "turned wrenches." (Kennedy Dep., pp. 27-28.) When LEO was in shipyard during each winter, Kennedy was very active in the repairs, maintenance, and modifications of the vessel.

13. Mr. Kennedy testified that, in the winter of 2008 or 2009 (he could not exactly recall), when LEO was in shipyard in Seward, Alaska, he remembers using the crane on a regular basis without the safety latch in place. Mr. Kennedy testified that he recalled that he was working on the "gear boxes" on LEO when he first noticed that the safety latch was missing. (Kennedy Dep., pp. 32-33; 35-36.) He also testified that if he could see invoices showing gear work, then he would be able to pinpoint the time when he first noticed the missing safety latch. His deposition testimony follows:

> Q: Let's talk about February.
> A: I can't remember for sure if I was down there in the winter of 09 in February. I can't say that for sure.
> .....
> Q: Let me ask you this: Do you remember seeing this vessel [LEO] or being on the vessel when the port side crane was being used?
> A: I did. And I actually used it myself. And I can't remember if it was winter of '08 or winter of '09, but we were pulling gears and stuff out of the engine room of the LEO.
> Q: And when you were using it at that period of time, the port side crane hook did not have a safety clasp?
> ....
> A: The answer is, yes, there was a clasp missing on the hook.
>
> (Kennedy Dep., pp. 32-33.)
>
> Q: Okay. Let me - - let me see if I can quantify it this way: The times that you were working for Coastal, so from 2007 when LEO was purchased and - - I should say the cranes were put on the time you left, can you give us an idea of how many times you were aboard that vessel with the cranes working?
> A: No, I mean, I - - more than a hundred.
> Q: Okay. And can you tell me during those hundred times did the crane hook ever have the safety clasp, the portside crane hook?
> A: It did.
> Q: Can you give us an estimate as to when it was removed or broken off?
> A: I can't. I can just tell you that it wasn't there in the winter when *we were working on the gear boxes.*
> Q: And working on the gear boxes would have been in the winter of '08 or the winter of '09?
> A: I do not know. I would have to *go back and look at invoices*, and *I can probably pinpoint it that way.*
> Q: But it would have been one or the other?
> A: Yes.
> Q: Okay. So either the crane hook was missing the safety clasp in the winter of '08 or - - or the winter of '09?
> A: That's correct.
>
> (Kennedy Dep., pp. 35-36 (emphasis added).)

14. Claimant had admitted into evidence Exhibits 117 and 105. Exhibit 117, pp. 16-24, was entitled "Leo, LLC Transaction Details By Account, June 1, 2005 through June 10, 2010 (Transaction Details)." Exhibit 105 is a vessel survey report for LEO. The

Transaction Details Exhibit reveals an entry for 2/29/2008, as follows: "TD 514 gears for LEO" and "$11,500." This transaction matches the vessel's survey report which describes the vessel's gear box as a "Twin Disc, model MG-514-C reversing marine gear." Mr. Kennedy said in his deposition that he was aboard LEO when he was doing gear box work and the invoices would reflect when that work was done. The court finds that Mr. Kennedy was aboard LEO in the winter of 2008 when he used the vessel crane without a safety latch.

15. Mr. Kennedy also testified that, when he used the cranes, he knew the crane hook should have a safety latch. (Kennedy Dep., p. 60-61.) Mr. Kennedy knew that the safety latch was designed and installed to prevent loads from inadvertently coming free from the crane hook. (*Id.*) Mr. Kennedy admitted that the hook should not have been used without a safety latch. (*Id.*) He knew that loads could come free from a hook without a safety latch and injuries could occur as a result. (*Id.*) Despite his recognition of the danger, Mr. Kennedy did not fix the crane hook; he did not "red tag" the crane hook; he did not order that the crane not be used until it was fixed. (*Id.*) He said that he told the captain to fix the crane hook. (Kennedy Dep., p. 40.)

16. Claimant Flora first worked with Coastal Seafoods/Leo, LLC from September to November 2008. Claimant worked as a deckhand and mate aboard LEO. At no time during Claimant's first period of employment on LEO did the portside crane hook have a safety latch.

17. Mr. Kennedy, did not follow up, after he realized that the hook was defective, to make sure that the crane hook was repaired. He did not follow up to make sure that the captain repaired the crane hook after he was told to do so. Although he was in charge of safety,

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 6
Case No. 09-1768RAJ

he took no effective measures to protect the employees exposed to the dangerous crane or to insure that it was repaired. Mr. Kennedy's actions and omissions constitute negligence and were a cause of Claimant's injury.

18. Mr. Kennedy was sufficiently senior in the Coastal Seafoods hierarchy to make his actual knowledge of the unseaworthy condition and his negligent failure to remedy the situation that of Coastal Seafoods. Mr. Kennedy's authority included supervision over the phase of the business out of which the injury occurred.

19. Claimant Flora returned to work on LEO in May 2009. He rejoined the vessel in the shipyard in Seward. Flora readied the vessel for the upcoming season. Coastal Seafoods planned to use the vessel as a fish tender vessel for the summer of 2009. When Flora rejoined the vessel in May 2009, the portside crane hook did not have a safety latch. At no time from the time Flora rejoined LEO until the date of his injury did the vessel's portside crane have a safety latch.

20. The crane hook, without a safety clasp, was used on LEO for months before Claimant's injury in June 2009. Claimant Flora joined the vessel the first time in September 2008. The crane hook did not have a safety clasp at that time. Despite the defective crane hook, the crew regularly used that crane.

21. Even though Coastal Seafoods hired a Vessel Manager to manage the vessels, they had no process or procedure or policy to make sure the vessels were safe.

22. The captain, Tim O'Donnell, admitted that he knew the crane hook did not have a safety latch when LEO sailed from the shipyard in Seward, Alaska, in May 2009. The captain testified that he had requested a replacement crane hook but that Coastal Seafoods

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7
Case No. 09-1768RAJ

denied that request. (O'Donnell Dep., p. 19-20, 30.)

23. After Claimant's injury, a spare hook, one with a safety latch, was retrieved from someplace, and the defective hook was replaced with a hook with a safety latch. It appears, from a photograph dated June 15, 2009 (Exhibit 120), that the replacement hook was not installed on LEO's crane until at least 3-4 days after Claimant's injury.

24. There is no clear testimony or evidence indicating how or when this spare hook got aboard LEO. Petitioners have no record of purchasing or delivering a spare hook to LEO. Petitioners offered no testimony or evidence about a spare hook. The only testimony, which is equivocal and vague, comes from Captain O'Donnell. Captain O'Donnell said *he may have bought* a used hook and brought it aboard the vessel in Seward in April 2009. (O'Donnell Dep., p. 19.) The captain also testified that Mr. Kennedy had "to approve anything that I was going to buy." (O'Donnell Dep., p. 21.) However, there is no evidence that the captain asked Mr. Kennedy to approve the purchase of a crane hook. There is no evidence that Mr. Kennedy, in fact, approved any such purchase. Mr. Kennedy testified that there would be a purchase order or invoice if a replacement hook was ordered. Furthermore, Petitioners did not prove that they delegated or relied upon the captain to fix or replace the dangerous crane hook.

25. Mr. Kennedy testified in his deposition that it could have been in the winter 2007-08 or 2008-09, he was not certain, when he saw that the crane and hook without the latch. He further testified in his deposition that he believed he saw that during the winter when the gear work was done on the vessel. Documents submitted into evidence and testimony establishes that the gear work was done in the spring of 2008. In addition, Mr. Flora testified that he personally observed Mr. Kennedy use the crane and hook without the latch in

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 8
Case No. 09-1768RAJ

November 2008. Taking all of the evidence in this case into consideration, the Court is persuaded that Mr. Kennedy was mistaken in his assessment that he utilized the crane during the winter during which the gear work was done. The Court reaches this conclusion on the following basis. The Court concludes that Mr. Flora's testimony about observing Mr. Kennedy using the crane in November 2008 is accurate. A review of Mr. Kennedy's deposition reveals, however, that he likely only used the crane on one occasion without the hook. Thus, taking Mr. Flora's testimony as credible, it is likely that this episode was in November 2008.

26. Petitioners contend that it is customary for the captain and crew to prepare a vessel for work after the vessel leaves port and is underway. But it was not reasonable for Petitioners to rely on the crew to repair the crane hook after the vessel left Seward in May 2009 because the captain had failed to repair the hook ever since November 2008. The vessel was laid up in Seward from November 2008 until May 2009, so there was plenty of time to have a safety item of equipment repaired, especially when it was known to management, and when it would have taken less than one hour to replace the hook. Kennedy Dep., p. 49-50. The court is not persuaded by Petitioners' excuses for failing to fix the crane hook.

27. Petitioners claim that the crane hook was not unseaworthy until it was used because the hook could be closed by wire (called mousing) or a shackle. First, Launa Santi, in her deposition, testified that she raised this possibility when she first got onboard and could see that the crane hook had no safety latch. But, because the crew needed to repeatedly change out crane rigging, Ms. Santi was told that mousing was not a viable option. (Santi Dep., p. 25.) Second, there is no evidence that mousing or closing the hook with a shackle was ever intended. There was no training or instruction given to the crew to mouse or shackle the hook.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9
Case No. 09-1768RAJ

The court finds that at the time the vessel started its voyage, the crane hook, without the safety latch, was not reasonably fit for its intended purpose.

28. Claimant filed a lawsuit against Leo, LLC, Coastal Villages Regional Fund and Coastal Villages Seafoods, LLC in King County Superior Court, Case No. 09-2-32978-8, on September 8, 2009. Thereafter, Petitioners filed this action praying for a judgment allowing it to limit its liability under federal law, 46 U.S.C. §30501. This court, pursuant to the stipulation of the parties, granted Claimant leave of this court's injunction, under the "single claimant exception," in order to pursue his case on damages in the state court. The parties reached agreement as to the quantum of damages in that state action, subject to this court's judgment on whether Petitioners are able to limit their liability.

29. Given the ownership/management structure, for purposes of Limitation of Liability, the "privity or knowledge" of Coastal Seafoods is attributed to the other Petitioners.

30. LEO's crane hook was not reasonably fit for its intended purposes when the vessel sailed from the shipyard in Seward, nor was it reasonably fit from September 2008, when Mr. Flora joined the vessel up to and including the date that Mr. Flora was injured. Petitioners failed to provide a seaworthy vessel when the vessel sailed from Seward in May 2009. The crane hook was in the same exact condition when the vessel sailed as when the hook was used, and the parties agree that at the time Mr. Flora was injured, the crane hook was unseaworthy. LEO's crane hook had no safety latch for at least seven months before Claimant's injury and, therefore, was not reasonably fit when she sailed from Seward in May 2009.

Based upon these Findings of Fact, established by a preponderance of the evidence, the court now makes the following Conclusions of Law.

# CONCLUSIONS OF LAW

1.      This court has jurisdiction pursuant to 28 U.S.C. § 1333, and venue is proper in this district.

2.      Pursuant to the Limitation of Shipowner's Liability Act ("Limitation Act'), 46 U.S.C. § 30501, a vessel owner facing liability may petition the Court to limit its liability to the value of its vessel and pending freight.

3.      To limit its liability, Limitation Petitioners must show, by a preponderance of the evidence, that the negligent acts or unseaworthy conditions that legally caused Claimant's injury were not within their privity or knowledge. *See* 46 U.S.C. § 30505; *Shaver Transp. Co. v. Chamberlain*, 399 F.2d 893, 895 (9th Cir. 1968); *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir. 1999).

4.      Seaworthiness requires a vessel to be reasonably fit for her intended purpose. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549 (1960); *Matter of Hechinger*, 1990 AMC 765, 771-72, 890 F.2d 202, 207 (9th Cir. 1989). The duty to provide a seaworthy vessel is non-delegable. *Mahnich v. Southern S.S. Co.,* 321 U.S. 96, 102 (1944). The duty is absolute - "essentially a species of liability without fault...." *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 94-95 (1946). "Due diligence of the owner" does not relieve the shipowner from the obligation to provide a seaworthy vessel. *Sieracki* at 104 (Stone, J., dissenting); *Mahnich*, 321 U.S. at 100-01.

5.      Claimant has sustained his burden of proving negligence of Coastal Seafood and Leo, LLC and the unseaworthiness of M/V LEO. Claimant has sustained his burden of proving that Petitioners' negligence was a cause of his injuries and that the unseaworthiness of LEO was a substantial cause of his injuries. Accordingly, Petitioners are not exonerated from liability. With regards to the next step, whether Petitioners can limit their liability, Petitioners shoulder the burden of proving that they lack "privity or knowledge" of the cause of plaintiff's

injury. *See In Re Messina*, 574 F.3d 119, 126-27 (2d Cir. 2009); *In re United States*, 303 F.Supp. 1282, 1302-03 (E.D.N.C. 1969), *aff'd.*, 432 F.2d 1357 (4th Cir. 1970). Petitioners, in this case, fail to meet their burden of proof to show lack of privity or knowledge of the several independent causes of Claimant's injury.

6. A shipowner may not limit its liability under the Limitation Act if its ship is unseaworthy due to equipment which was defective at the commencement of the voyage. Petitioners here are charged with knowledge of the existence of the condition. *Villers Seafood Co. v. Vest*, 813 F.2d 339, 343 (11th Cir. 1987). The LEO was unseaworthy at the commencement of the voyage, and limitation is denied for this reason, among others.

7. Moreover, when a seaman is injured by an unseaworthy condition of which a manager has actual knowledge, limitation is denied. In this case, it is undisputed that Mr. Kennedy had actual knowledge of the unseaworthy condition that injured Mr. Flora.

In *Shaver Transp. Co. v. Chamberlain*, 399 F.2d 893, 895 (9th Cir. 1968), an engineer was severely injured when he was pulled into an improperly guarded drive shaft. The Ninth Circuit upheld the trial court's denial of limitation. Limitation was denied because vessel managers had actual knowledge of the unseaworthy condition before the seaman was injured. A vessel manager's actual knowledge of the causative unseaworthy condition required denial of limitation.

Likewise, in *Joia v. Jo-Ja Service Corp.*, 817 F.2d 908, 913 (1st Cir. 1987), a vessel was loading fuel oil and a tank overflowed, causing an unseaworthy condition, a very slippery deck. The vessel manager knew about the unseaworthy condition and told a crew member to clean it up. The crew member did not clean it up, and another worker was injured when he slipped and fell. Limitation was denied because a vessel manager had actual knowledge of the unseaworthy condition before the worker was injured. And, the instruction of a subordinate to remedy the unseaworthy condition did not negate the manager's actual knowledge of the unseaworthy

condition.

The Ninth Circuit Court of Appeals has addressed the fact that in a limitation case, when a manager knows of an unseaworthy condition, his instruction to a subordinate to remedy the condition does not negate the manager's actual knowledge. In *States S.S. Co. v. United States,* 259 F.2d 458, 472 (9th Cir. 1957), *cert. denied*, 358 U.S. 933 (1959), citing with approval to Supreme Court precedent, the Ninth Circuit stated in relevant part:

> [W]here the circumstances are such that the owners or managing agents have a duty to act to see that the vessel is made seaworthy, a neglect or failure to take such action will require denial of limitation. Mere instructions to subordinate employees will not suffice to give the owner the benefit of the limitation act.

In *States S.S. Co.,* limitation was denied because a vessel manager had actual knowledge of the unseaworthy condition that ultimately caused the loss.

The limitation statute expressly provides that limitation requires a lack of "knowledge" on the owner's part. It is undisputed that Mr. Kennedy had actual knowledge of the unseaworthy condition, thus limitation must be denied for this reason.

8. As an independent and alternative basis for denial of Coastal Seafoods' petition to limit liability, the failure of Mr. Kennedy to fix the defective crane hook or to prohibit use of the defective crane hook until it was fixed constitutes negligence of Coastal Seafoods. Mr. Kennedy had actual knowledge of the defective crane hook, knew it was dangerous, and knew it needed to be repaired. He also testified that he used the dangerously defective crane hook himself. As the Vessel Manager in charge of safety, Mr. Kennedy's use of the hook established the corporation's practice that it was allowable to use a dangerous crane in a state of disrepair. Even if he thereafter reminded the captain to repair the defective hook, Mr. Kennedy's failure to follow up to ensure that it was repaired or replaced is negligence of Petitioners and is a substantial cause of Claimant's injury. Likewise, Mr. Kennedy's failure to "red tag" or prohibit use of the crane until it was repaired is negligence within the privity or knowledge of

Petitioners.

9. Petitioners contend that they used "reasonable diligence" to make the vessel seaworthy by delegating the task of repairing the defective crane hook to the captain. Petitioners apparently rely upon certain cargo or property damage cases to support their argument. *See Horn v. Cia de Navegacion Fruco, SA.*, 404 F.2d 422, 428 (5th Cir. 1969); *Waterman S.S. Corp. v. Gay Cottons*, 414 F.2d 724, 728-29 (9th Cir. 1969). Petitioners' reliance on this line of cases, however, is misplaced. In a seaman's case, the shipowner must provide a seaworthy vessel, one that is reasonably fit. *See Mitchell*, 362 U.S. at 549. In a cargo damage case, however, the Carriage of Goods By Sea Act (46 U.S.C. §1300) and the Harter Act (46 U.S.C. §190) cuts down the warranty of seaworthiness to an obligation to use due diligence to make the vessel seaworthy in a <u>property damage</u> case. *Horn*, 404 F.2d at 428; *Waterman*, 414 F.2d at 728. That relaxation, however, has not extended, either by statute or by decision, to the like <u>obligation of the owner to the seaman</u>. *Mahnich*, 321 U.S. at 100-01. For reasons set forth above, Petitioners' reliance upon the captain to repair the dangerous crane hook, if in fact Petitioners did so, was not reasonable. Regardless, the Manager had actual knowledge of the dangerous crane hook - the cause of Claimant's injury - and that knowledge is not erased or forgiven, for purposes of limitation, even if the Petitioners ordered the captain to repair the dangerous crane hook.

10. As an additional, independent and alternative basis for denial of Coastal Seafoods' petition to limit liability by Leo, LLC, its ranking employee, Captain O'Donnell, had knowledge of the unseaworthy condition that caused Claimant's injury. As a matter of law, Leo, LLC cannot limit liability. Knowledge of the master may be imputed to a corporate owner where the master is a corporate officer and/or has management responsibility. *See Silver Line v. United States*, 94 F.2d 776, 780 (9th Cir. 1937). Apparently, Captain O'Donnell was the only employee of Leo, LLC with managerial responsibilities. The vessel owner can not

limit liability by giving the "managerial functions" to an employed person acting as its agent: "So far as concerns privity and knowledge, such an agent is its alter ego." *Silver Line*, 94 F.2d at 780.

11. A vessel owner has the obligation to provide a competent master and crew. *Admiral Towing Co. v. Woolen*, 290 F.2d 641, 646 (9th Cir. 1961). Accordingly, a vessel owner who breaches this duty renders a vessel unseaworthy and may not limit its liability. *See, e.g., In re Sause Bros. Ocean Towing*, 769 F.Supp. 1147, 1154-55 (D. Or. 1991) (inexperienced crew not competent to carry hazardous cargo into expected bad weather; crew not trained to operate emergency towing device).

12. Petitioners, through Mr. Kennedy, cannot simply tell the captain to fix the defective and dangerous crane hook and claim benefit of limitation. Petitioners, after becoming aware of the dangerous and unseaworthy condition, had to do more. They had to prohibit use of the crane until it was fixed; or, they had to make sure that it was fixed before the vessel sailed from Seward; or, they had to instruct the captain not to use the crane hook until it was fixed; or, they had to do something to ensure that the dangerous crane hook would not be used and hurt someone.

13. Petitioners regularly used the defective crane hook for months before Claimant's injury. Implementation of a reasonable safety inspection policy would have addressed the defective hook. The repeated use of this dangerous hook is negligence, independent from the captain's or the Vessel Manager's negligence. This negligence also serves to bar the limitation of liability.

14. Claimant has established, by a preponderance of evidence, that Petitioners were negligent and the vessel was unseaworthy. Claimant has also proven, under the proper standards for negligence causation and unseaworthiness causation, that Petitioners' negligence and the unseaworthy condition caused Claimant's injuries.

15. Petitioners cannot limit their liability. Petitioners have not carried their burden to prove that they had no privity or knowledge of the causes of Claimant's injury. In addition, Mr. Flora independently proved by a clear preponderance of the evidence that the Petitioners had privity and knowledge of the unseaworthy condition and that the Petitioners' negligence caused Mr. Flora's injuries. The Petition For Limitation of Liability is hereby dismissed with prejudice.

Dated this 4th day of November, 2011.

*Richard A. Jones*
The Honorable Richard A. Jones
United States District Judge